UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | | |
|---|---|---|
| **ROSIE L. MUSE** | * | **CIVIL ACTION NO. 10-1809** |
| **VERSUS** | * | **JUDGE ROBERT G. JAMES** |
| **MICHAEL J. ASTRUE, COMMISSIONER, SOCIAL SECURITY ADMINISTRATION** | * | **MAG. JUDGE KAREN L. HAYES** |

<u>REPORT AND RECOMMENDATION</u>

Before the court is plaintiff's petition for review of the Commissioner's denial of social security disability benefits. The appeal was referred to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the reasons assigned below, it is recommended that the decision of the Commissioner be **AFFIRMED**, and this matter **DISMISSED** with prejudice.

<u>Background & Procedural History</u>

On January 14, 2009, Rosie L. Muse protectively filed the instant applications for Title II Widow's Insurance Benefits and Title XVI Supplemental Security Income payments. (Tr. 15, 114-124). She alleged disability as of April 1, 2002, because of arthritis, bronchitis, right eye cataract, and high blood pressure. (Tr. 137, 158-159). The state agency denied the claims at the initial stage of the administrative process. (Tr. 54-64). Thereafter, Muse requested and received a July 29, 2009, hearing before an Administrative Law Judge ("ALJ"). ( Tr. 26-53). However, in a November 24, 2009, written decision, the ALJ determined that Muse was not disabled under the Social Security Act, finding at Step Five of the sequential evaluation process that she was able to make an adjustment to other work that exists in substantial numbers in the national

economy. (Tr. 12-22). Muse appealed the adverse decision to the Appeals Council. Nevertheless, on October 13, 2010, the Appeals Council denied Muse's request for review; thus the ALJ's decision became the final decision of the Commissioner. (Tr. 1-3).

On December 7, 2010, Muse sought review before this court. She alleges the following errors:

(1) the ALJ's reasons for rejecting the assessment of plaintiff's treating physician are not supported by substantial evidence;

(2) the ALJ's credibility finding is not supported by substantial evidence; and

(3) the Commissioner did not meet his burden at Step Five of the sequential evaluation process.

### Standard of Review

This court's standard of review is (1) whether substantial evidence of record supports the ALJ's determination, and (2) whether the decision comports with relevant legal standards. *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990). Where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's decision is not supported by substantial evidence when the decision is reached by applying improper legal standards. *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. at 401. Substantial evidence lies somewhere between a scintilla and a preponderance. *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991). A finding of no substantial evidence is proper when no credible medical findings or evidence support the ALJ's determination. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988). The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the

Commissioner.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citation omitted).

## Determination of Disability

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability.  *See* 42 U.S.C. § 423(a)(1)(D).  The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).  Based on a claimant's age, education, and work experience, the SSA utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work.  *See* 42 U.S.C. § 423(d)(2)(A).  Furthermore, a disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the SSA.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA.  *See* 20 C.F.R. §§ 404.1520, 416.920.  The steps are as follows,

(1) An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

(2) An individual who does not have a "severe impairment" of the requisite duration will not be found disabled.

(3) An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1] will be considered disabled without the consideration of vocational factors.

(4) If an individual's residual functional capacity is such that he or she can

> still perform past relevant work, then a finding of "not disabled" will be made.
>
> (5) If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make an adjustment to other work in the economy.

*See Boyd v. Apfel*, 239 F.3d 698, 704 -705 (5th Cir. 2001); 20 C.F.R. § 404.1520.

The claimant bears the burden of proving a disability under the first four steps of the analysis; under the fifth step, however, the Commissioner must show that the claimant is capable of performing work in the national economy and is therefore not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987). When a finding of "disabled" or "not disabled" may be made at any step, the process is terminated. *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990). If at any point during the five-step review the claimant is found to be disabled or not disabled, that finding is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

## Analysis

### I. Steps One, Two, and Three

The ALJ determined at Step One of the sequential evaluation process that Muse did not engage in substantial gainful activity during the relevant period. (Tr. 17). At Step Two, he found that she suffers severe impairments of fibromyalgia, hypertension, right eye cataract, and obesity. *Id*. The ALJ concluded, however, that the impairments were not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, at Step Three of the process. (Tr. 17-18).

### II. Residual Functional Capacity

The ALJ next determined that Muse retained the residual functional capacity for light work, except that she is able to lift/carry 20 pounds occasionally and 10 pounds frequently; stand

and/or walk (with normal breaks) for fours hour in an eight hour work-day; sit (with normal breaks) about four to six hours; occasionally climb ramps/stairs, but no ladders/scaffolds; occasionally balance, stoop, kneel, and crouch, but no crawling; frequent near visual acuity; and depth perception accommodation and field of vision are limited because of monocular vision. (Tr. 19).[1]

In so deciding, the ALJ partially discounted Muse's testimony and the assessment of her treating physician, Allen Spires, M.D. Instead, he assigned "significant weight to the objective findings" of the consultative physician, David Hebert, M.D., but assigned limited weight to his medical source statement. (Tr. 20). He further accorded "more weight" to the opinion of the non-examining agency physician, Johnny Craig, M.D. *Id*.

a)   Summary of Relevant Medical Evidence

The instant medical record is relatively sparse. It appears that plaintiff first saw Allen Spires, M.D. in October 2007 for complaints of dizziness. *See* Tr. 188. She did not return to see him, however, until January 29, 2009, (after she filed the instant application), with complaints of dizziness, hip and hand pain, and shortness of breath. (Tr. 187). Spires diagnosed Muse with

---

[1] Light work contemplates:
> . . . lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

elevated blood pressure. *Id*. She returned to Spires on February 4, 2009, whereupon he diagnosed fibromyalgia. (Tr. 186). Her physical examination was within normal limits. *Id*.

On March 4, 2009, Dr. Spires re-diagnosed fibromyalgia, and again found that Muse's physical examination was within normal limits. (Tr. 185). On June 1, 2009, Muse presented to Dr. Spires with complaints of numbness in her hands, swelling in her feet, left leg weakness, headaches, and dizziness. (Tr. 211). Despite these complaints, Spires noted that her physical examination was within normal limits. *Id*.

On July 15, 2009, Muse presented to Spires with complaints of dizziness and "hurting." (Tr. 210). Spires found that her physical examination was within normal limits, but this time, commented that she was tender in all joints. *Id*. He diagnosed fibromyalgia. *Id*.

On July 15, 2009, Dr. Spires also completed an attorney-supplied medical source statement, wherein he indicated that Muse suffered from hypertension, degenerative arthritis, peripheral neuropathy, and fibromyalgia. (Tr. 207). He opined that Muse could not work, that she could stand for up to 15 minutes at one time, occasionally lift up to 20 pounds, frequently lift 10 pounds, occasionally bend, frequently manipulate her hands, and frequently had to elevate her legs during an 8 hour workday. *Id*. He indicated that her pain was moderate to severe. *Id*. He commented that her fibromyalgia was severe "with difficulty in ambulation." *Id*. Furthermore, her constant pain prevented her from performing activities of daily living. *Id*. She also exhibited poor sleep patterns. *Id*.

Meanwhile, three months earlier, on April 7, 2009, David Hebert, M.D., examined Muse at the request of Disability Determination Services. (Tr. 193-196). Plaintiff's chief complaints at the time were generalized arthritis all over her body, bronchitis, cataracts in her right eye, and high blood pressure. *Id*. Muse stated that the doctors told her that her pain was caused by

fibromyalgia. *Id*. She also reported suffering from asthma for most of her adult life. *Id*. Actually, however, she had a cough and generalized shortness of breath on performing activities for more than 5-10 minutes and wheezing. *Id*. For asthma, Muse used Albuterol in a hand-held nebulizer four times per day. *Id*. She stated that her hypertension caused her to be weak and tired all of the time. *Id*. She denied chest pain, swollen ankles, irregular pulse, palpitations, shortness of breath on exertion, and history of congestive heart failure or myocardial infarction. *Id*. Her only medications were Flextra for arthritis, Dyazide for hypertension, and her Albuterol inhaler. *Id*. She had no history of dizziness, etc. *Id*. She also had no history of neck pain, stiffness or decreased motion to the neck. *Id*. She had questionable weakness of all the muscles. *Id*. She essentially had monocular vision, because of a dense cataract in the right eye that needed to be removed. *Id*.

Upon examination, her lungs were clear, with no rales, ronchi or wheezes. *Id*. Her gait and station were completely normal, without any assistive devices. *Id*. She had no erythema or swelling of any joints, including in her fingers and hands. *Id*. She exhibited no motor or sensory deficits; no pathological reflexes; motor strength in all areas was 5/5; hand grip was 5/5 bilaterally; hand dexterity and hand grasping were all quite good. *Id*. X-rays of the chest showed that the heart and structures were normal; the lungs were clear of all infiltrates. *Id*. She had a full range of motion in all joints. *Id*.

Hebert diagnosed past history of asthma, with no history of any significant pulmonary disease; essentially monocular vision of the right eye that was 20/40; arterial hypertension that was well-controlled; non-specific arthralgia, with no significant impairment of function of any joints, including the hands. *Id*. Medically, Hebert saw no reason why Muse could not perform routine walking, sitting, standing, carrying and lifting for an 8 hour day. Mentally, she was alert

and quite functional. *Id.*

On April 17, 2009, Johnny Craig, M.D., a non-examining agency physician, reviewed the record and Dr. Hebert's examination findings before opining that Muse retained the residual functional capacity for medium work, with limitations on depth perception, accommodation, and field of vision. (Tr. 198-206).

      b)    <u>Discussion</u>

Plaintiff takes issue with the ALJ's residual functional capacity assessment. She argues that the ALJ erred when he declined to adopt the limitations assigned by her treating physician, Dr. Spires. The court recognizes that

> "ordinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir.1985). **The treating physician's opinions, however, are far from conclusive. "[T]he ALJ has the sole responsibility for determining the claimant's disability status."** *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir.1990).
>
> **Accordingly, when good cause is shown, less weight, little weight, or even no weight may be given to the physician's testimony**. The good cause exceptions we have recognized include disregarding statements that are brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence. *Scott*, 770 F.2d at 485. In sum, the ALJ "is entitled to determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly." *Id.*; see also 20 C.F.R. § 404.1527(c)(2) ("If any of the evidence in your case record, including any medical opinion(s), is inconsistent with other evidence or is internally inconsistent, we will weigh all the other evidence and see whether we can decide whether you are disabled based on the evidence we have.").

*Greenspan*, 38 F.3d at 237 (emphasis added).

Here, the ALJ acknowledged the medical source statement by Dr. Spires, but noted that it was

not supported by other objective evidence, or by detailed, clinical, and diagnostic evidence. (Tr. 20). Plaintiff faults the ALJ's rationale for rejecting Dr. Spires' assessment, at least in part, because normal physical examinations and objective testing are not particularly relevant for gauging the effects of fibromyalgia. The court agrees, in principle. However, Dr. Spires' assessment was premised upon other diagnoses and observations (e.g., hypertension, degenerative arthritis, and peripheral neuropathy) that *are* subject to more conventional analyses. Nonetheless, Dr. Hebert's examination findings were essentially benign. (Tr. 193-196). Furthermore, Spires' opinion was premised upon his belief that Muse had difficulty ambulating and that she was unable to perform activities of daily living. (Tr. 207). Again, however, Hebert remarked that Muse's gait and station were "completely normal." (Tr. 195). Further, although Muse clearly reported that she experienced significant limitations with her activities of daily living, she also indicated that she lives alone, handles her personal hygiene, washes clothes, cooks some simple meals, and watches television. *See* Tr. 141-148, 37-38.

Spires also opined that Muse needed to "frequently" elevate her legs during the workday. (Tr. 207). At the hearing, however, Muse testified that she had to elevate her legs no more than three times per day: once for 30 minutes in the morning; again for 30 minutes in the evening; and then for up to ten minutes at nighttime. (Tr. 34). She later clarified that she only elevated her legs twice per day during daylight hours. (Tr. 40). There is no indication that plaintiff could not elevate her legs either before or after work, and/or during normal work breaks, including lunch. Similarly, there is no reason why plaintiff could not use her nebulizer during these same periods. *See* Tr. 32-33, 42 (uses nebulizer when she wakes up and at 4:00 or 5:00 p.m.).

Spires' other limitations that are inconsistent with the ALJ's residual functional capacity assessment prove similarly unavailing. For instance, his statement that plaintiff cannot work any

9

hours per day is akin to a physician's statement that a claimant is disabled or unable to work, which, under the regulations, is accorded no special significance. 20 C.F.R. § 404.1527(e)(1); *Frank v. Barnhart*, 326 F.3d 618 (5th Cir. 2003). Spires also limited plaintiff to standing for no more than 15 minutes at a time. However, there is no indication that this limitation stemmed from fibromyalgia.[2] Rather, it likely stems from complaints of left leg weakness and edema of the lower extremities, which were not supported *upon examination* by Dr. Hebert or by Dr. Spires' own progress notes. *See* Tr. 210-216, 193-196.[3]

The instant ALJ discussed the competing evidence that conflicted with Dr. Spires' assessment. *See Ward v. Barnhart*, 192 Fed. Appx. 305, 308, 2006 WL 2167675 (5th Cir. 08/02/2006) (unpubl.). In the end, however, he only gave limited weight to Spires' opinion, and incorporated solely Spires' lifting and bending limitations. The ALJ's decision to place little weight, or to "effectively [reject]" some of the limitation(s) recognized by Dr. Spires is supported by substantial evidence. *Id*.; *see also, Nugent v. Astrue*, 2008 WL 2073891 (5th Cir. May 16, 2008) (ALJ entitled to discount treating physician's conclusory statement because it contradicted earlier treatment notes, objective medical findings, and other examining physicians' opinions).[4]

---

[2] Plaintiff attributed her need to elevate her legs to hip pain caused by fibromyalgia. (Tr. 40-41). Dr. Spires linked the severity of Muse's fibromyalgia to her difficulty with ambulation. *See* Tr. 207. The consultative examiner, however, observed no difficulty with ambulation. (Tr. 193-196).

[3] On one occasion, Dr. Spires noted complaints of swelling in the feet and left leg weakness. (Tr. 211). These complaints were not substantiated, however, because her physical examination remained within normal limits. *Id*.

[4] The court further observes that the "questionnaire" format employed by Dr. Spires typifies "brief or conclusory" testimony sufficient to support an ALJ's decision not to accord the evidence "considerable weight." *Foster v. Astrue*, 2011 WL 480036 (5th Cir. Feb. 10, 2011) (unpubl.).

This resolution of the contradictory medical evidence remained within the province of the ALJ.

Plaintiff further contends that the ALJ failed to fully and fairly develop the record by not re-contacting Dr. Spires in an effort to resolve his concerns. The regulations provide that the Commissioner will seek additional evidence or clarification from a treating source when: 1) the report from the source contains a conflict or ambiguity that needs to be resolved; 2) the report does not contain all of the necessary information; or 3) the report does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1512(e).

Here, it is manifest that the ALJ discounted Dr. Spires' assessment because it was not supported by Spires' own objective medical findings and other medical evidence. This rationale does not appear to be one of the three grounds that would require the ALJ to re-contact the physician. But, to the extent that the ALJ was obliged to re-contact Dr. Spires, the court observes that an ALJ's failure to adequately develop the record does not automatically compel reversal. *Hyde v. Astrue*, Docket No. 07-30748 (5th Cir. May 12, 2008) (unpubl.) (citing *Kane v. Heckler*, 731 F.2d 1216 (5th Cir. 1984)). To obtain reversal because of an ALJ's failure to adequately develop the record, the claimant must also demonstrate resulting prejudice. *Brock v. Chater*, 84 F.3d 726 (5th Cir. 1996). "To establish prejudice, a claimant must show that [she] could and would have adduced evidence that might have altered the result." *Id.* (internal quotation marks omitted). Mere speculation that additional evidence might have made a difference does not suffice. *Hyde, supra*. Plaintiff has not made that showing here.

Plaintiff further argues that the ALJ's credibility determination is not supported by substantial evidence. When assessing credibility, the ALJ is required to consider the objective medical evidence, the claimant's statements, the claimant's daily activities, and other relevant evidence. SSR 96-7p. The ALJ also must consider inconsistencies in the evidence and conflicts

between the claimant's statements and the remainder of the evidence. 20 C.F.R. § 404.1529(c)(4). However, the ALJ need not follow formalistic rules in his credibility assessment. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994).

In this case, the ALJ determined that plaintiff was "partially credible." (Tr. 20). Indeed, plaintiff's own testimony undermines the bases for some of the limitations imposed by Dr. Spires. *See* discussion, *supra*. Nonetheless, the ALJ found that plaintiff's statements regarding the limiting effects of her symptoms were not credible to the extent that they were inconsistent with the ALJ's residual functional capacity assessment. (Tr. 20). In the end, the ALJ credited the examination findings of Dr. Hebert, plus some of the limitations imposed by the non-examining agency physician and plaintiff's treating physician. *See* Tr. 20. The ALJ's analysis satisfied the requirements of 20 C.F.R. § 404.1529, and his resolution is supported by substantial evidence. *See Undheim v. Barnhart*, 214 Fed. Appx. 448 (5th Cir. Jan. 19, 2007) (unpubl.) (opinion as a whole gave sufficient reasons and documentation for the ALJ's credibility determination); *Cornett v. Astrue*, 261 Fed. Appx. 644 (5th Cir. Jan. 3, 2008) (unpubl.) (ALJ gave some weight to claimant's complaints; thus claimant's arguments that his subjective complaints were not given enough weight is unavailing); *Hernandez v. Astrue*, 2008 WL 2037273 (5th Cir. May 13, 2008) (unpubl.) (despite claimant's subjective allegations of pain, the ALJ gave "greatest weight" to treating physician's opinion).

### III.    Step Five

The ALJ concluded at Step Four of the sequential evaluation process that Muse could not perform her past relevant work. (Tr. 20-21). Accordingly, he proceeded to Step Five. At this step, the ALJ employed a vocational expert ("VE") to determine whether a claimant with Muse's age, vocational background, and residual functional capacity could make an adjustment to other

work. In response, the VE opined that such a hypothetical claimant could perform the representative occupation of Companion, DOT Code # 309.677-010, which is a light, semi-skilled position (SVP 3), with 132,756 positions nationally, and 2,602 positions in the regional economy. (Tr. 50). This occupation represents a significant number of jobs in the "national economy." 42 U.S.C. § 423(d)(2)(A); *Johnson v. Chater*, 108 F.3d 178, 181 (8th Cir. 1997) (200 jobs at state level and 10,000 nationally, constitute a significant number); (Tr. 22).

Plaintiff contends that the ALJ's Step Five conclusion is flawed because his hypothetical to the VE failed to include additional limitations identified by her and her treating physician. However, a hypothetical need only reasonably incorporate the disabilities and limitations recognized by the ALJ. *Bowling v. Shalala*, 36 F.3d 431 (5th Cir. 1994). Here, the ALJ's hypothetical to the VE faithfully incorporated all of the limitations recognized in his residual functional capacity assessment, and that assessment is supported by substantial evidence. *See* discussion, *supra*.[5]

Plaintiff further argues that because she has no transferrable skills from her past relevant work, as a matter of law, she cannot make an adjustment to semi-skilled work as a Companion. In support of her argument, plaintiff cites, out of context, a passage from Social Security Ruling 83-10 which states that

> the [a]bility to perform skilled or semiskilled work depends on the presence of acquired skills which may be transferred to such work from past job experience above the unskilled level or the presence of recently completed education which allows for direct entry into skilled or semiskilled work . . .

SSR 83-10.

---

[5] The VE testified that there would be no available work for a hypothetical claimant who needed to elevate her legs for 30 minutes during *un-scheduled* breaks. (Tr. 51). Here, however, there is no creditable evidence that plaintiff cannot accommodate her other alleged limitations during the lunch period and regular breaks.

However, Social Security Ruling 83-10 addresses the capability to do other work under the medical-vocational guidelines, not when the ALJ relies upon vocational expert testimony. *See* SSR 83-10, TITLES II AND XVI: DETERMINING CAPABILITY TO DO OTHER WORK--THE MEDICAL-VOCATIONAL RULES OF APPENDIX 2. Moreover, under the medical-vocational guidelines and associated regulations, transferability of skills at the light exertional level does not become an issue unless and until the claimant is at least closely approaching advanced age and further significantly limited by illiteracy, etc. *See* Rule 202.00(c)-(f), Subpart P, Regulations App. 2; *see also*, 20 C.F.R. § 404.1568(d)(4) (discussing transferability of skills for persons of advanced age). Although the medical-vocational guidelines typically take notice of an occupational base comprised of unskilled work, this changes for the higher age classifications, at which point the guidelines include skilled and semi-skilled work that require the claimant to have transferable skills from a prior job, or recent training that provides for direct entry into semi-skilled or skilled work. *See* SSR 83-10. This is because as a claimant ages, it becomes more difficult for her to make an adjustment to other work.

Here, however, the ALJ relied upon vocational expert testimony for his Step Five determination. The VE testified that someone with plaintiff's age, education, training, and work experience could make an adjustment to the position of Companion. *See* Tr. 45-51. Plaintiff has not identified any regulation that prohibits an adjustment to semiskilled work under these circumstances. Accordingly, the record reflects an adequate basis to support the ALJ's decision to defer to the expertise of the VE. *Carey v. Apfel*, 230 F.3d 131, 146 (5th Cir. 2000).[6]

---

[6] In any event, ". . . claimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing." *Carey, supra*. Certainly, if plaintiff harbored any doubts concerning the validity of the VE's opinion,

## Conclusion

The ALJ in this case was tasked with determining whether plaintiff was disabled. In so doing, he considered the claimant's testimony, the medical record, and expert opinion evidence. The evidence was not uniform and could have supported a different outcome. However, the ALJ ultimately grounded his decision upon consideration of the totality of the evidence, including his resolution of the conflicting medical opinions and hearing testimony. Such conflicts in the evidence are for the Commissioner to resolve. *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990) (citation omitted); *Grant v. Richardson*, 445 F.2d 656 (5th Cir. 1971) (citation omitted). This court may not "reweigh the evidence in the record, try the issues de novo, or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." *Newton, supra*.[7]

For the foregoing reasons, the undersigned finds that the Commissioner's determination that plaintiff was not disabled under the Social Security Act, is supported by substantial evidence and remains free of legal error. Accordingly,

**IT IS RECOMMENDED** that the Commissioner's decision to deny disability benefits be **AFFIRMED**, and that this civil action be **DISMISSED** with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and FRCP Rule 72(b), the parties have

---

she was obliged to raise the issue upon cross-examination, rather than preserving the undisclosed issue as a potential basis to support reversal upon appeal.

[7] Admittedly, this court has expanded upon some of the reasoning provided by the ALJ in his decision. Generally, courts "only may affirm an agency decision on the basis of the rationale it advanced below." *January v. Astrue*, No. 10-30345, 2010 WL 4386754 (5th Cir. Nov. 5, 2010) (citation omitted). One exception to this rule, however, is harmless error, i.e. absent the alleged error or omission, there is "no realistic possibility" that the ALJ would have reached a different result. *Id*. This exception is applicable here.

**fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN(14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED in chambers, at Monroe, Louisiana, this 21st day of December 2011.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE